1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States District Court*
*For the Northern District of California*

*E-FILED - 5/30/08*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KRISTIN RAY HIMMELBERGER,

          Petitioner,

  v.

A.A. LAMARQUE, Warden,

          Respondent.

_____/

No. C 00-20198 RMW (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Petitioner Kristin R. Himmelberger, a California state prisoner who is proceeding pro se,

filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1996

conviction by a jury on counts of attempted murder of a peace officer, robbery, assault with a deadly

weapon, possession of explosives, possession of an assault weapon, and auto theft.  In response to

the order to show cause, respondent has filed an answer and memorandum of points and authorities,

and has lodged supporting exhibits.  Petitioner has filed a traverse.  For the reasons discussed below,

the court denies the petition.

1

# BACKGROUND

2

The California Court of Appeal summarized the facts of the case as follows:

3
4
5

In January 1996, Hiroyuki Chinone, Morteza Khodabakhsh, and [petitioner] lived in rented rooms in a house in Cupertino[, California] that was owned by Brian Edwards, who lived in a trailer behind the house. [Petitioner] owned a dog, which lived in a trailer with him in the same house. Edwards knew [petitioner] as Joel Fosnaugh.

6

Edwards had told [petitioner] to leave "because he was giving problems there." Edwards had, in fact, initiated eviction proceedings against [petitioner].

7
8
9

On January 11, 1996, between 4:00 and 4:30 a.m., Chinone woke up. He noticed a person standing outside his window, wearing a ski mask and pointing a rifle at him. The person told Chinone to give him Chinone's wallet and car key. Chinone recognized the person's voice as [petitioner's].

10
11

Chinone pretended to look for his wallet and car key, then told [petitioner] he could not find them. [Petitioner] entered Chinone's room through an open window. Once inside, [petitioner] again demanded Chinone's wallet and car key. He might have also asked for Chinone's ATM card.

12
13

[Petitioner] continued to point his rifle at Chinone. Chinone saw a potato stuck on the end of the gun. The rifle looked like the one that [petitioner] had kept in his room and had previously shown to Chinone.

14
15
16
17

After getting Chinone's wallet and car key, [petitioner], using a wire, tied Chinone's arms behind his back. [Petitioner] also tied Chinone's legs and then placed Chinone face-down on the bed. He stuffed Chinone's mouth with a sponge and secured the sponge with tape wrapped around Chinone's head. [Petitioner] threatened to kill Chinone or his family if Chinone reported the incident to the police. He then left the house by the front door and started Chinone's car. Chinone recognized the sound of his car's engine.

18
19
20

When he heard his car start, Chinone untied himself and went to the backyard. In the backyard, Chinone heard his car returning. Chinone hid under a car in the backyard. Chinone heard footsteps from the car to the house and inside the house. The footsteps later returned to the car. Chinone heard the car driving away. Not long after, Chinone heard gunshots coming from north of the house.

21

Chinone reported the incident to Edwards, who called police.

22
23
24
25

Meanwhile, Deputy Mark Garcia of the Santa Clara County Sheriff's office was patrolling the Cupertino area with a marked patrol car. He saw a white compact Toyota coming towards him at high speed. As the Toyota turned an intersection, it almost collided with Garcia's car. Garcia and the Toyota slammed on their brakes to avoid collision. Garcia came to a near stop. The other car slowed down to about 15 or 20 miles per hour.

26
27
28

As the cars slowed down, and the drivers' windows of the cars came close to each other, Garcia looked inside the Toyota to see whether anyone else was inside it. Garcia saw no one else. Garcia observed the Toyota driver to be sweating, his hair "all messed up," and his eyes "wide" and "excited." Garcia later identified the Toyota driver as [petitioner]. [Petitioner] accelerated away from Garcia, who gave

chase.

When Garcia caught up with [petitioner], Garcia turned on his red emergency lights. [Petitioner] turned into a church parking lot. Garcia followed him. As Garcia entered the parking lot, he heard a loud blast. Garcia felt glass in his head; it came from the right side of his windshield. Garcia saw "spider webbing" on that side of his windshield. Almost at the same time, Garcia saw [petitioner] exiting the Toyota through the driver's side window.

Garcia slammed on his brakes and "rolled over to the right, lying down." Garcia drew his weapon and reached for his radio. As he did so, Garcia heard a second shot fired from a high powered weapon. Garcia tried looking at [petitioner] over the dashboard, but ducked again when he heard a third shot and felt fragments of glass hit his face. The third shot hit the headrest of Garcia's driver seat. Garcia raised his head a second time. He heard a fourth shot. More glass fragments hit Garcia's face. Garcia stuck his gun out through the driver's window and started firing. Although [petitioner] continued to fire at Garcia, Garcia observed that [petitioner] had retreated from his previous position. Garcia exited his car and fired more shots at [petitioner]. [Petitioner] disappeared into some nearby bushes. A dog jumped out of the Toyota and ran away.

Other officers arrived at the scene. When the officers inspected Garcia's patrol car, they found three bullet holes in the windshield, two in the front hood, and two in the driver's headrest. The headrest holes indicated that Garcia would have been hit in the head had he been sitting upright at the time the bullets were fired.

The officers also searched the Toyota. They found a Southwest Airline gun box with "Joel Fosnaugh" written on the tag, a baseball cap and two boxes of rifle ammunition. In addition, the officers found pieces of potato splattered from the driver's door to the rear passenger window of the Toyota. A subsequent search of the Toyota also uncovered personal items, such as bank checks and credit cards, which carried one of three names: Joel Fosnaugh, Kristin Himmelberger, and Kris Fosnaugh. The Toyota search also revealed a pipe bomb, an incomplete pipe bomb, a can containing black gun powder, and a ski mask. The officers found [petitioner's] latent fingerprint in the black powder can.

Later in the morning, the police brought in a bloodhound to assist in the search for [petitioner]. Using the ski mask for scent, the dog led the police to [petitioner] who was hiding in a spa. [Petitioner] ran away, but was caught shortly thereafter and arrested by the police.

The trail which the dog followed passed through a yard in which an assault rifle was later discovered by a resident. The resident had heard someone pass by his house at approximately 5 a.m. on January 11. About two weeks later, the resident found the rifle.

At trial, Chinone testified that the recovered rifle looked like the rifle that [petitioner] had pointed at him. Evidence was introduced showing that the recovered rifle was the same rifle that was used to fire the bullet jacket that had been recovered from the church parking lot.

Ans., Ex. E (Opinion of the California Court of Appeal, Sixth Appellate District, People v.

Himmelberger, ("Op.") No. H016559 (Sep. 3, 1998) at 3-7).

**United States District Court**
For the Northern District of California

1  After a state jury trial, petitioner was found guilty of the attempted murder of a peace officer,

2  robbery, assault with a deadly weapon, possession of explosives, possession of an assault weapon,

3  and auto theft.  Id. at 1-2.  The Superior Court for the County of Santa Clara sentenced petitioner to

4  prison for life with the possibility of parole.  Id. at 2.  The California Court of Appeal for the Sixth

5  Appellate District, in a reasoned and unpublished opinion, affirmed the trial court judgment and

6  denied petitioner's contemporaneously filed petition for a writ of habeas corpus.[1]  Id. at 21.  The

7  California Supreme Court denied petitioner's petition for review and his petition for a writ of habeas

8  corpus.  Ans. at 2.  After filing the present federal habeas corpus petition, petitioner then filed two

9  more state habeas corpus petitions, both of which the California Supreme Court denied.  Id.  After

10  granting petitioner leave to file a second amended petition, this court issued an order to show cause,

11  finding that the new petition presented the following cognizable claims for relief:  (A) the ineffective

12  assistance of trial counsel; (B) insufficiency of the evidence to support the conviction for attempted

13  murder; and (c) the denial of petitioner's right to self-representation.[2]

14  **STANDARD OF REVIEW**

15  A federal habeas court will entertain a petition for a writ of habeas corpus "in behalf of a

16  person in custody pursuant to the judgment of a State court only on the ground that he is in custody

17  in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

18  court may not grant a petition with respect to any claim that was adjudicated on the merits in state

19  court unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or

20  involved an unreasonable application of, clearly established Federal law, as determined by the

21  Supreme Court of the United States."  Id. § 2254(d)(1).

22  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

23  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

24  _____

25  1. Petitioner did not provide the court with a copy of the petition he filed with the state
26  appellate court.  Petitioner, however, did provide the court with a copy of the petition he
    filed with the California Supreme Court.

27  2. Because the second amended petition is the operative petition, the court will refer to it
28  as the "petition."

Order Denying Petition for Writ of Habeas Corpus
G:\pro-se\sj.rmw\hc.00\Himmelberger198.dsm.md        4

state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. (Terry) Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

The state court decision to which 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, in this case the opinion of the California Court of Appeal. See Nunnemaker at 801-06; Shackleford v. Hubbard, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Id.

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

## DISCUSSION

**A.      Claims of Ineffective Assistance of Counsel**

Petitioner contends that trial counsel rendered ineffective assistance of counsel because   (1) she had a conflict of interest with him, (2) she did not permit petitioner to testify at trial, (3) she did not interview all witnesses or satisfactorily investigate the facts of the case, (4) she failed to make an objection to the constitutionality of a statute, (5) she failed to request certain jury instructions, (6) she did not bring a Fourth Amendment challenge, and (7) she did not raise a challenge to the composition of the jury.  The court will address these claims in turn after a review of the applicable federal law.

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-68.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish incompetence under the first prong.  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

1.      Alleged Conflict of Interest

Petitioner contends that a conflict of interest between him and his trial counsel was of such significance as to render his counsel ineffective.  Pet., P. & A. at 13-14.  This alleged conflict of interest arose from disagreements over trial strategies and tactics, which the court details below.  Id. Petitioner also asserts that the trial court failed to inquire adequately into the basis of his alleged

1   lawsuit against his trial counsel and its effect on his trial counsel's ability to represent him. Id. at 19.

2

3          On three occasions prior to the start of trial petitioner sought to obtain new appointed

4   counsel under People v. Marsden, 2 Cal.3d 118 (1970), based on an alleged conflict of interest.

5   Ans., Ex. E at 2. The trial court denied the motions. Id. On appeal, petitioner argued that the denial

6   violated his state and federal constitutional rights to the effective assistance of counsel. Id. at 7-8.

7          The California Court of Appeal found no merit to petitioner's claim. It summarized its

8   factual findings and legal conclusions as follows:

9       At the first Marsden hearing, [petitioner] explained why he was not satisfied with trial
    counsel's performance. [Petitioner] informed the court that he had filed a federal
10   lawsuit against his attorney for misrepresentation. The court asked [petitioner]: "With
    a claim in a federal lawsuit with an alleged misrepresentation, what is that about?"
11   [Petitioner] replied: "Just about the whole process in my whole dealings with Ms.
    Street (Deputy Public Defender) that I've come across."

12
    The court pressed [petitioner]: "Could you be a little more explicit in terms of things
13   that prove your innocence that she refuses to deal with or acknowledge?" [Petitioner]
    complained that he "had to waive time because Ms. Street didn't have a defense
14   prepared and I've been here for 9 months and they haven't done nothing for me."
    [Petitioner] also complained that he had submitted the names of certain witnesses to
15   trial counsel for investigation and that he had heard nothing from her." [Petitioner] said
    he had suggested a mock trial, but counsel had told [him that] he could not testify
16   because the district attorney had said that [petitioner] had a prior arrest for vehicular
    manslaughter, and other priors, which the prosecution would bring up if [petitioner]
17   testified. [Petitioner] said, "okay."

18   Asked to respond, trial counsel told the court: "I met with Mr. Himmelberger. I
    promised him I would give him the best defense he has. I'm prepared to evaluate any
19   investigation he'd like us to do. I would clarify that if there is something that I can't
    prove I think that the code requires me to bring evidence in and you have to have
20   competent evidence, mere allegation, speculation or conjecture can be 352'd out and as
    far as my workings with him, he's absolutely correct that I have talked to him quickly
21   about the evidence that they have against him and different ways it could go. I should
    clarify there's been no deal, no settlement conferences to date and I would simply note
22   for the record I did advise him to waive time because we were in the process of doing a
    psychological evaluation that was not yet complete and that evaluation was especially
23   paid for by my office."

24   After more colloquy with [petitioner] and his counsel, the court denied [petitioner's]
    first Marsden motion, stating: "[A] Marsden motion should not be granted unless
25   [petitioner's] reasons for wanting a different attorney are substantial. The court should
    not substitute counsel when the showing of conflict is a conflict of personalities or as
26   subjected to satisfaction. [Petitioner] is not entitled to an attorney who will conduct a
    case according to the [petitioner's] wishes. A disagreement even as to a tactic or
27   strategy is not sufficient to require substitution of counsel nor is [petitioner's]
    intelligence or failure to cooperate in this case. I've given to you a long time to talk

28

Order Denying Petition for Writ of Habeas Corpus
G:\pro-se\sj.rmw\hc.00\Himmelberger198.dsm.md     7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

about your reasons and none of the reasons individually and the reasons when added together are substantial.  It does not appear to me there is a conflict."

After [petitioner's] counsel had responded to each of [petitioner's] complaints, the court denied [petitioner's] second Marsden motion, saying: "It's not legally meritorious.  [¶]  In listening to what Miss Street has had to say this afternoon, it's clear to me she's doing everything in her power to represent you.  She's a very competent lawyer.  She has given her reasons as to why there is no basis for this 995 motion.  On the witnesses, all the witnesses you have provided to her have been statementized."

A third Marsden hearing was conducted on November 13, 1996.  However, since [petitioner] has not included such a hearing in his claim of Marsden error, that hearing will not be included in this part of the discussion.

Here, when the trial court in both Marsden hearings asked [petitioner] what the federal complaint was about, [petitioner] gave general and vague answers which failed to establish actual conflict of interest.  To repeat Hardy: "A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel."  (2 Cal.4th at p. 138; emphasis omitted.)

We conclude that under the circumstances, it was not unreasonable for the trial court to implicitly find no actual conflict of interest, and to infer that [petitioner] "was merely attempting to manufacture a possible conflict of interest to try and delay his trial."  (People v. Hardy, supra, 2 Cal.4th at p. 138.)

[Petitioner's] claim that no inquiry was made of appellant about the substance of the federal lawsuit is belied by the recorded proceedings quoted above.  The problem was not lack of inquiry; the problem was the insufficiency of [petitioner's] answers to the inquiry.  Therefore, assuming the trial court had a duty of inquiry, that duty was met on these facts.

Op. at 8-13.

On federal habeas corpus review, the ultimate question for the federal court is whether the state court's refusal to substitute counsel "actually violated [petitioner's] Sixth Amendment rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir. 2000).  The Sixth Amendment does not guarantee a "meaningful relationship" between a defendant and defense counsel or the absolute right to appointed counsel of the defendant's choice.  See Morris v. Slappy, 461 U.S. 1, 13-14 (1983).  Although a criminal defendant cannot be compelled to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict, see United States v. Moore, 159 F.3d 1154, 1159-60 (9th Cir. 1998), not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment

1  rights.  Schell, 218 F.3d at 1027 (citing Morris, 461 U.S. at 13-14).  Judicial scrutiny of counsel's

2  performance must be highly deferential and a court must indulge a strong presumption that counsel's

3  conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at

4  689.  A criminal defense attorney "is in the best position professionally and ethically to determine

5  when a conflict of interest exists or will probably develop in the course of a trial," Holloway v.

6  Arkansas, 435 U.S. 475, 485 (1978), and "trial courts necessarily rely in large measure upon the

7  good faith and good judgment of defense counsel."  Cuyler v. Sullivan, 446 U.S. 335, 347 (1980).

8         When a defendant voices a seemingly substantial complaint about counsel, the trial judge

9  should make a thorough inquiry into the reasons for the defendant's dissatisfaction.  See Bland v.

10  California Dep't of Corrections, 20 F.3d 1469, 1475-76 (9th Cir. 1994), cert. denied, 513 U.S. 947

11  (1994), overruled on other grounds by Schell, 218 F.3d at 1025; Hudson v. Rushen, 686 F.2d 826,

12  829 (9th Cir. 1982).  However, the inquiry need only be as comprehensive as the circumstances

13  reasonably would permit.  See King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992).

14         Petitioner's claim as to the trial court's error is without merit.  The record shows that the trial

15  court inquired into his claims against his trial counsel by allowing petitioner to speak in detail about

16  his concerns and questioning petitioner's counsel about them.  Ans., Reporter's Transcript ("RT")

17  9/26/96.  Furthermore, the court finds that petitioner has not shown that a conflict existed that

18  resulted in a denial of his right to the effective assistance of counsel either because of the lawsuit or

19  because of a disagreement over trial strategy and tactics.  As to the first point, there is no evidence,

20  other than his statements, that petitioner filed a federal lawsuit.  No copy of a complaint was provided

21  at either Marsden hearing, nor has one been included by petitioner with his exhibits to the present

22  petition.  Even if petitioner had filed such a lawsuit, such a fact on its own does not establish an

23  actual conflict.  See Moore, 159 F.3d at 1158.

24

25         As to the second point, petitioner has not presented a reasonable basis for his contention that

26  trial counsel's decisions regarding evidentiary matters were incompetent.  Largely strategic in nature,

27  they revolved around trial counsel's decisions regarding evidentiary matters, the calling of witnesses,

28

1   a potential plea bargain and whether petitioner should testify at trial, allegations the court examines in

2   detail below in sections A.2-A.7.  Ans., RT 9/26/96 at 11.  From the examination below, the court has

3   not found any errors that resulted in the deprivation of petitioner's right to the effective assistance of

4   counsel.

5         The court finds that the state court's determination that no actual or potential conflict existed

6   which required the substitution of counsel was not contrary to, or an unreasonable application of,

7   clearly established Supreme Court precedent, nor was it based on an unreasonable determination of

8   the facts in light of the evidence presented under  28 U.S.C. § 2254 (d)(1), (2).

9         2.    Claim Regarding the Right to Testify

10        Petitioner contends that trial counsel rendered ineffective assistance by failing to tell him that

11  he had the right to testify, thereby refusing petitioner the opportunity to testify at trial.  Pet., P. & A.

12  at 26.  Had he been allowed to do so, petitioner asserts that "there is a reasonable likelihood that the

13  result of the trial would have been different," because he would have "testified that he did not shoot

14  at the deputy . . . [and] that Chicone . . . fired shots at the deputy."  Id. at 26, 34.

15        In support of these contentions petitioner states that he repeatedly expressed to trial counsel

16  his desire to testify.  Id. at 26.  Petitioner was surprised when trial counsel rested without calling him

17  as a witness and he was told it was too late for his testimony.  Id. at 26-27.   Petitioner argues that an

18  unsophisticated defendant, already hesitant to speak out in court, should not be expected to advise the

19  court of his wishes at that point.  Id. at 29.  Petitioner urges the court to adopt the rule that when a

20  defendant wishes to testify, against the advice of counsel, counsel should either advise the defendant

21  of his obligation to notify the court, or counsel should notify the court on the defendant's behalf.  Id.

22  at 31.

23        The state appellate court found the facts regarding petitioner's lack of testimony to be as

24  follows:

25        The record shows that the defense rested its case on December 12, 1996.  The next day,
           December 13, the parties argued their case to the jury.  On December 16, 1996, the jury
26         returned its verdict.  After the jury was discharged, [petitioner] requested the court to appoint
           new counsel for him for the specific purpose of filing an ineffective assistance of counsel
27         claim.  The court granted [petitioner's] request.

28

United States District Court
For the Northern District of California

On February 5, 1997, [petitioner's] new counsel filed a motion for new trial on the ground that [petitioner's] trial counsel was ineffective in failing to allow [petitioner] to testify at his trial. The motion was heard on February 21, 1997. On the same day, the court also heard [petitioner's] fourth <u>Marsden</u> motion to relieve his trial counsel.

At the fourth <u>Marsden</u> hearing, [petitioner's] trial counsel, addressing [petitioner's] request to take the witness stand, testified as follows: "As far as the mock trial that [petitioner] is talking about, he had indicated to me that he wanted to testify. I did have a representative of our office - it was Mark Becker - available to do a cross-examination of Mr. Himmelberger. After meeting with Mr. Himmelberger at least twice, and I know I conferred with him many times about the fact that - whether he should or should not testify. It was clearly my advice that he not testify. I spoke to him at length and he agreed that it would be best not to testify. He changed his mind after the evidence was all in and we had rested, and I indicated to him that it was not in his interest to testify."

Following trial counsel's testimony, the trial court denied [petitioner's] fourth <u>Marsden</u> motion, Thereafter, the court also denied [petitioner's] motion for a new trial on the basis of <u>People v. Alcala</u>, 4 Cal.4th 742 (1992).

Op. at 13-14.

The right to testify on one's own behalf at a criminal trial is one of the rights that is "essential to due process of law in a fair adversary process." <u>Rock v. Arkansas</u>, 483 U.S. 44, 51 (1987) (<u>citing</u> <u>Faretta v. California</u>, 422 U.S. 806, 819, n.15 (1975)). The right to testify is fundamental and personal and therefore it can only be relinquished by the person to whom it belongs, here the petitioner when he was a defendant in the criminal trial. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938). Such a relinquishment must be intentional and knowing. <u>Id.</u> The Ninth Circuit has held that neither the court nor counsel must advise a defendant of his right to testify against counsel's advice. <u>United States v. Edwards</u>, 897 F.2d 445, 447 (9th Cir.). <u>United States v. Nohara</u>, 3 F.3d 1239, 1244 (9th Cir. 1993).

An attorney's reasonable, strategic determination that a client would not be well served by opening himself to cross-examination does not render her an ineffective counsel. <u>U.S. v. Martinez</u>, 883 F.2d 750, 755 (9th Cir. 1989), <u>vacated on other grounds</u>, 928 F.2d 1470 (9th Cir. 1991). In <u>Martinez</u>, defense counsel did not believe his client would perjure himself on the stand. <u>Id.</u> at 752. However, out of concern that the testimony would be inconsistent with other witnesses, that his client had a prior conviction for a similar crime, and that the prosecution would call a damaging rebuttal witness, the attorney determined that Martinez should not testify. <u>Id.</u> at 755. His determination could

1    not support a claim for ineffective assistance of counsel.  Id.

2        The court finds that petitioner has not demonstrated that trial counsel deprived him of his right

3    to testify.  Rather, the record, cited above, shows that petitioner's trial counsel advised her client not

4    to testify, and he agreed that it would be best not to do so.  Such evidence indicates that petitioner

5    waived his right to testify.  Furthermore, petitioner's contention that his rights were violated because

6    trial counsel failed to tell him that he had a right to testify is meritless –   petitioner's own statements

7    on the record show that before trial petitioner was well aware of his right to testify.  Ans., RT 9/26/96

8    at 10-11, 19.  Because petitioner has failed to show that trial counsel's performance was deficient, the

9    court does not reach the prejudice prong of the Strickland test.  See Siripongs v. Calderon, 133 F.3d

10   732, 737 (9th Cir. 1998).

11       The court finds that the state court's determination was not contrary to, or an unreasonable

12   application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

13   determination of the facts in light of the evidence presented under  28 U.S.C. § 2254 (d)(1), (2).

14       3.    Claim Regarding Investigation of Potential Defense Witnesses

15       Petitioner contends that trial counsel "failed to conduct a reasonable investigation . . . by

16   failing to conduct a[n] interview of [witness] Dirk Bruno, and in relying [instead] on the [s]heriff

17   investigator['s] report."  Pet., P. & A. at 50.  If trial counsel had interviewed and presented this

18   witness, "he could have altered significantly the evidentiary posture and would have allowed the jury

19   to balance more even handily the evidence to reach its verdict.  Further and more importantly his

20   testimony disputes and shatters [Officer] Garcia's testimony and puts in question his credibility."  Id.

21   at 51.  It appears that this claim was not raised on appeal.

22       At petitioner's pre-trial Marsden hearing, petitioner told that court that there was "this witness

23   Bruno" trial counsel had to interview.  Ans., RT 9/26/96 at 10.  Dirk Bruno, who had been

24   interviewed by the Santa Clara County Sheriff, witnessed, from a distance, the events of petitioner's

25   commitment offense.  Pet., Ex. 25 at 1-2.  In his statement, Bruno relates that he observed a white car,

26   whose driver he could not see, "proceeding at a high rate of speed" near his house, followed by a

27   sheriff's vehicle.  Id.  He saw the two vehicles stop in a church parking lot and then he heard several

28

1   gun and rifle shots.  Id. at 2.  At a later Marsden hearing, trial counsel stated that, with the exception

2   of Officer Garcia, every witness petitioner asked to be investigated was interviewed and a statement

3   was taken from them.  Ans., RT 10/28/96 at 12.  Trial counsel stated that her client had "refused to

4   give me some information on the grounds he doesn't trust me."  Id. at 13.  Petitioner did not mention

5   Bruno at this hearing.

6       "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that

7   makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to

8   investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy

9   measure of deference to counsel's judgments."  Strickland, 466 U.S. at 691.  The duty to investigate

10  and prepare a defense does not require that every conceivable witness be interviewed.  Hendricks v.

11  Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995).  A claim of failure to interview a witness cannot

12  establish ineffective assistance when the person's account is otherwise fairly known to defense

13  counsel.  Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986).  A defendant's mere

14  speculation that a witness might have given helpful information if interviewed is not enough to

15  establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended,

16  253 F.3d 1150 (9th Cir. 2001).

17      Petitioner's claim is without merit.  The evidence shows that Bruno's testimony would have

18  added little or nothing to petitioner's defense.  Based on his statement to the sheriff, Bruno would

19  have testified that he saw a police vehicle chase another vehicle, that the two vehicles stopped in a

20  parking lot, and that he heard gun and rifle shots.  Bruno could not identify any person or persons nor

21  did he see who shot at whom or with what weapon.  The court does not see how this evidence would

22  have influenced the jury's verdict or helped it to "balance" the evidence.  Also, because Bruno's

23  testimony would have added little or nothing to petitioner's defense, the court finds that trial

24  counsel's decision to rely on Bruno's statement to determine the value of his testimony rather than

25  interview him was reasonable under the circumstances and therefore cannot support a claim for

26  ineffective assistance of counsel.  Because petitioner has failed to show that trial counsel's

27  performance was deficient, the court does not reach the prejudice prong of the Strickland test.  See

28

United States District Court
For the Northern District of California

1   Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

2       The court finds that the state court's determination was not contrary to, or an unreasonable

3   application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

4   determination of the facts in light of the evidence presented under  28 U.S.C. § 2254(d)(1), (2).

5

6           4.      Challenging Conviction for Possession of an Assault Rifle

7       Petitioner contends that trial counsel rendered ineffective assistance because (a) she failed to

8   raise a constitutional challenge to the law under which he was convicted and (b) there was

9   insufficient evidence that petitioner possessed an unlawful assault weapon.[3]  It appears that this claim

10  was not raised on appeal.

11          a.      Constitutionality of California Penal Code section 12280(b)

12      In order to determine whether petitioner's claim has merit, the court must first determine

13  whether the statute is constitutional.  If the statute is constitutional, his claim for ineffective

14  assistance of counsel on this ground necessarily fails.

15      Petitioner, who was convicted of possessing and using an assault weapon, a violation of

16  California Penal Code sections 12280(b) and 245(d), contends that section 12280(b), along with its

17  defining statute California Penal Code section 12276(a)(11), are unconstitutionally vague and

18  irrational.  They also, petitioner contends, fail to meet the requirements of due process and equal

19  protection because they prohibit the use of weapons based on their brand and make, while excluding

20  other highly similar weapons simply because they are of a different brand.  Pet., P. & A. at 45-49.

21      Petitioner concedes that the weapon at issue in this case was a "Soviet SKS semiautomatic

22

23

24
_____

25  3.  In his first petition, later dismissed, and in his traverse, petitioner asserted that Cal. Pen.
    Code section 12281(b) conferred immunity on him for criminal prosecution under Cal. Pen.
26  Code section 12280.  Trav. at 14, n. 20.  The court asked respondent for further briefing on
    this issue.  Docket No. 56.  Petitioner, in his reply to the California Attorney General's
27  briefing, asked that the footnote in his traverse, cited above, "be stricken."  Docket No. 58.
    The court GRANTS petitioner's motion and will not, therefore, consider the point further.
28

Order Denying Petition for Writ of Habeas Corpus
G:\pro-se\sj.rmw\hc.00\Himmelberger198.dsm.md      14

1   carbine" rifle.[4]  Pet. at 41.  Originally, according to petitioner, the "rifle had a 10-round non-

2   detachable magazine, and it was modified to utilize a detachable magazine, which holds 30

3   cartridges." Id.

4        Possession of an "assault weapon" is unlawful in California.  Cal. Pen. Code § 12280(b).  An

5   "SKS with detachable magazine" is an "assault weapon" under California law.  Cal. Pen. Code  §

6   12276(a)(11).

7                          (i.)    Vagueness

8        Petitioner contends that the statute is "specifically vague as to the SKS weapon involved in

9   [this] case," because "SKS with a detachable magazine" can be interpreted in two ways.   Pet. at 46.

10  An "SKS with a detachable magazine" could mean, according to petitioner, either "any SKS that has

11  been equipped with a detachable magazine" or "the specific brand and model [] of SKS that was

12  designed to use a detachable magazine."  Id. Petitioner bases this second point on the fact that the

13  California Attorney General's Weapon Identification Guide – a guide created by law enforcement

14  under the authority of California Penal Code section 12276.5 that lists what firearms are "assault

15  weapons" – defines "SKS with a detachable magazine" differently than the how the statute defines it.

16  Id.

17       A state criminal statute may be challenged as unconstitutionally vague or overbroad or both

18  by way of a petition for a writ of habeas corpus by a prisoner convicted under the statute.  Vlasak v.

19  Superior Court of California, 329 F.3d 683, 688-90 (9th Cir. 2003).  To avoid constitutional

20  vagueness, a statute or ordinance must (1) define the offense with sufficient definiteness that ordinary

21  people can understand what conduct is prohibited; and (2) establish standards to permit police to

22  enforce the law in a non-arbitrary, non-discriminatory manner.  Id.

23       A statute will meet the certainty required by the Constitution if its language conveys

24  sufficiently definite warnings as to the proscribed conduct when measured by common understanding

25  and practices.  See Panther v. Hames, 991 F.2d 576, 578 (9th Cir. 1993).  In a facial vagueness

26

27  4. According to the prosecution's expert witness, SKS "roughly translates" to
    "semiautomatic carbine Simonov," Simonov being the designer of the weapon.  Ans., RT
28  12/12/96 at 633.

United States District Court
For the Northern District of California

1   challenge, the court must look to the plain language of the statute, as well as construe the statute as it

2   has been interpreted by the state courts.  See Nunez by Nunez v. City of San Diego, 114 F.3d 935,

3   941-42 (9th Cir. 1997).

4          The court concludes that the statute is not unconstitutionally vague.  Under the first part of the

5   Vlasak analysis, any ordinary person would understand that the statute prohibits possession of an

6   SKS with a magazine, whether it is equipped or is just designed to carry a magazine, as the statute's

7   use of "any" indicates.  Therefore, it is immaterial that the statute is perhaps open to the two

8   interpretations petitioner puts forth – under either interpretation, possession of the weapon is clearly

9   illegal.  The court finds the Attorney's General's list to be of no matter – it is, in the words of

10   respondent, a tool for law enforcement and is not relevant to this court's determination of the statute's

11   constitutionality.

12          Under the second part of the Vlasak analysis, the court concludes that the statute establishes

13   standards that permit the police to enforce the law in a non-arbitrary, non-discriminatory manner.

14   The statute clearly states that possession of an SKS with a magazine is prohibited, which allows the

15   police to arrest any possessor of such a weapon.  The court finds no plausible reading of the statute

16   that mandates, encourages, or even suggests that, the police  enforce the prohibition in any other way

17   than in a non-arbitrary or non-discriminatory manner.  The California courts' interpretation of the

18   statute, as in the California Supreme Court's decision in Kasler v. Lockyer, 23 Cal. 4th 472 (Cal.

19   2000), is consonant with that of this court.

20                    (ii.)    Equal Protection

21          Petitioner contends that the statute violates the Equal Protection Clause because it designates

22   weapons by "brand and model, rather than by type."  Pet., P. & A. at 49.  Specifically, it singles out

23   the SKS, petitioner contends, and not a similar or identical weapon of another brand and model.  Id.

24          Unless the United States Supreme Court requires otherwise, a state law that mandates the

25   same treatment for any person who commits a particular crime does not violate equal protection.  See

26   Alvarado v. Hill, 252 F.3d 1066, 1069-70 (9th Cir. 2001).

27          The court concludes that the statute does not violate the Equal Protection Clause.  Under the

28

United States District Court
For the Northern District of California

analysis put forth in <u>Alvarado v. Hill</u>, the court finds that the state statute mandates the same treatment for any person who commits the particular crime of possessing an SKS with a detachable magazine.  Petitioner has not presented evidence that the possession of similar weapons not also prohibited by this statute creates any invidious distinction.

Furthermore, plaintiff has cited no convincing authority otherwise.  In support of his contention, petitioner cites <u>Kasler vs. Lungren</u>, 78 Cal. Rptr. 2d 260 (Cal. App. 1998), which found that California Penal Code section 12275, the introductory statute of the title to which section 12280 (b) belongs, violates the Equal Protection Clause.  Whatever value this case may have had is now gone, as the California Supreme Court reversed the lower court's ruling and found the statute constitutional in <u>Kasler v. Lockyer</u>, 23 Cal.4th 472 (Cal. 2000).  Petitioner also cites a New York state case and a Sixth Circuit case, neither of which analyze the statute at hand or are binding on this court.

Turning to the central claim regarding his legal representation, petitioner's claim is meritless.  His ineffective assistance of counsel claim is based on his assertion that the statutes were unconstitutional and, consequently, that counsel rendered ineffective assistance in not objecting to his being tried under them.  Because the court has determined that the statutes are constitutional, trial counsel's not objecting cannot constitute ineffective assistance of counsel.  Petitioner's claim that trial counsel rendered ineffective assistance by failing to object to the testimony of the expert witness is also meritless, bound up as it is with his now discredited assertion that the statutes were unconstitutional.

Because petitioner has not shown a deficient performance, the court does not reach the second prong of <u>Strickland</u>, that is, whether trial counsel's performance resulted in prejudice to petitioner.  <u>Siripongs</u>, 133 F.3d at 737.

The court finds that the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented under 28 U.S.C. § 2254(d)(1), (2).

     5.    <u>Jury Instructions</u>

United States District Court
For the Northern District of California

1    Petitioner contends that trial counsel rendered ineffective assistance by failing to request a

2    jury instruction that the charges of attempted murder and assault were alleged in the alternative, the

3    assault being a lesser-related offense of attempted murder.  Pet., P. & A. at 52, 54.  Petitioner also

4    contends that trial counsel failed to request a jury instruction that attempted voluntary manslaughter

5    is a lesser included offense of attempted murder.  Id. at 55.  It appears that these claims were not

6    raised on appeal.

7    This double-barreled contention can be addressed as one claim.  The failure of a state trial

8    court to instruct on lesser-included offenses in a non-capital case does not present a federal

9    constitutional claim.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).  However, "the

10   defendant's right to adequate jury instructions on his or her theory of the case might, in some cases,

11   constitute an exception to the general rule."  Id., 219 F.3d at 929 (citing Bashor v. Risley, 730 F.2d at

12   1240).  Solis suggests that there must be substantial evidence to warrant the instruction on the lesser

13   included offense.  Id., 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser

14   included offense to murder because evidence presented at trial precluded a heat of passion or

15   imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence

16   presented at trial implied malice).

17   Petitioner's claim is without merit.  Under Solis, the failure of a trial court to instruct on a

18   lesser-included offense does not present a federal constitutional claim.  If such a failure on the part of

19   the trial court does not present a federal claim, then, certainly, a failure by trial counsel to propose

20   such an instruction does not constitute a deficient performance.  Furthermore, petitioner has not

21   contended or presented any supporting evidence that his case is an exception to the general rule

22   announced in Solis.  Since petitioner has not shown a deficient performance, the court does not reach

23   the second prong of Strickland, that is, whether trial counsel's performance resulted in prejudice to

24   petitioner.  Siripongs, 133 F.3d at 737.

25   Accordingly, the court finds that the state court's determination was not contrary to, or an

26   unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

27   unreasonable determination of the facts in light of the evidence presented under 28 U.S.C. § 2254

28

United States District Court
For the Northern District of California

1 (d)(1), (2).

2        6.     Fourth Amendment Challenge

3        Petitioner contends that trial counsel rendered ineffective assistance by failing to object to his

4 unlawful seizure by Officer Garcia, a violation of his rights under the Fourth Amendment.  Pet., P. &

5 A. at 56, 59.  It appears that this claim was not raised on appeal.

6        Stone v. Powell, 428 U.S. 465, 481-82, 494 (1976), bars federal habeas review of Fourth

7 Amendment claims unless the state did not provide an opportunity for full and fair litigation of those

8 claims.  The existence of a state procedure allowing an opportunity for full and fair litigation of

9 Fourth Amendment claims, rather than a defendant's actual use of those procedures, bars federal

10 habeas consideration of those claims.  See Gordon v. Duran, 895 F.2d 610, 613-614 (9th Cir. 1990)

11 (whether or not defendant litigated Fourth Amendment claim in state court is irrelevant if he had

12 opportunity to do so under California law).

13        Under California law, a defendant can move to suppress evidence on the basis that it was

14 obtained in violation of the Fourth Amendment. Cal. Pen. Code § 1538.5.

15        Petitioner's claim is without merit.  Even though the court has no record that a hearing was

16 held on this issue, consideration of the issue is foreclosed by the precedents stated above.

17 Specifically, because California does provide an opportunity for a full and fair litigation of any

18 Fourth Amendment claim, this court must deny habeas relief.

19        Even if the court were not foreclosed from considering the claim, petitioner's claim cannot

20 stand.  Petitioner was travelling at a high speed, nearly collided with a police vehicle and then sped

21 off, circumstances that provide a peace officer with probable cause to stop a vehicle for purposes of

22 investigation.

23        Accordingly, the court finds that the state court's determination was not contrary to, or an

24 unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

25 unreasonable determination of the facts in light of the evidence presented under 28 U.S.C. § 2254

26 (d)(1), (2).

27        7.     Failure to Challenge the Composition of the Jury Pool

28

United States District Court
For the Northern District of California

1    Petitioner contends that trial counsel rendered ineffective assistance when she failed to object

2  to the composition of the jury, a violation of petitioner's right to equal protection.  Pet., P. & A. at 59.

3  Specifically, petitioner contends that he "was denied a cross representation of the community.

4  Petitioner did not have any African-American[s] in his jury, and had only one in the pool, [and] there

5  were a few Asians and Hispanics."  Id. at 60.  In support of his contention, petitioner states that

6  "[a]ccording to the Bay Area Market Face Guide (98), the African-American, Asian and Hispanic

7  population account for approximately 48% of Santa Clara County," the county in which petitioner

8  was convicted.  Id.  It appears that this issue was not raised on appeal.

9    Before it proceeds to analyze petitioner's claim, the court must correct a misapprehension.  A

10  claim that a jury was not composed of a cross-representation of the community is a Sixth Amendment

11  claim, not an Equal Protection Clause claim.  So, though petitioner contends that this was a violation

12  of his right to equal protection, it is really a Sixth Amendment claim and the court will address it as

13  one.

14    A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair

15  and impartial jury pool composed of a cross-section of the community.  See Holland v. Illinois, 493

16  U.S. 474, 476 (1990).  The fair cross-section requirement applies only to the larger jury pool or

17  venire and is not applicable to petit juries.  See Lockhart v. McCree, 476 U.S. 162, 173-74 (1986).

18  So although the Sixth Amendment guarantees that the petit jury will be selected from a pool of names

19  representing a cross-section of the community, it does not require that petit juries actually chosen

20  must mirror the community and reflect the various distinctive groups in the population.  See Taylor,

21  419 U.S. at 538.

22    In Duren v. Missouri, 439 U.S. 357 (1979), the Supreme Court held that to establish a prima

23  facie violation of the fair cross section requirement, a defendant must show that (1) the group alleged

24  to be excluded is a "distinctive" group in the community (see, e.g., United States v. Cannady, 54 F.3d

25  544, 547 (9th Cir. 1995) (African-Americans Hispanics and Asians are distinct groups); United States

26  v. Fletcher, 965 F.2d 781, 781 (9th Cir. 1992) (college students not distinct group)), (2) the group was

27  not fairly represented in the venire from which the petit jury was chosen (see, e.g., United States v.

28

United States District Court
For the Northern District of California

1    Nelson, 137 F.3d 1094, 1101 (9th Cir. 1998) (representation constitutionally sufficient where

2    absolute disparity between proportion of Hispanics in the community and proportion of Hispanics in

3    the jury pool was 3.9%); United States v. Esquivel, 88 F.3d 722, 726 (9th Cir. 1996) (requiring

4    "absolute disparity" between number of persons from distinctive group in jury pool in relation to

5    number of such persons in community and finding that 4.9% absolute disparity was insufficient to

6    make out claim); Cannady, 54 F.3d at 548 (representation constitutionally sufficient where absolute

7    disparity below 7.7%)), and (3) the underrepresentation resulted from a systematic exclusion of the

8    group in the jury selection process (see, e.g., United States v. Miller, 771 F.2d 1219, 1228 (9th Cir.

9    1985) (no systematic exclusion when only 30% of grand jury members and only 42% of venire were

10    women absent showing that under-representation of women occurred generally in other venires)).

11    See Duren, 439 U.S. at 367.

12        Petitioner's claim is meritless.  Even if petitioner has met the first requirement of Duren, he

13    has not met the remaining two.  First, because the Sixth Amendment does not apply to petit juries,

14    petitioner's claim regarding his petit jury cannot stand.  Second, his claim about the jury pool is

15    without merit.  The single statistic he cites – even if true – does not show that the group or groups

16    was not fairly represented in the venire or that there has been a systematic exclusion of the group or

17    groups in the jury selection process.  First, the statistic seems to speak to a population account for

18    1998, not 1996, the year petitioner was convicted.  Second, the statistic simply states that those

19    groups make up 48% of the Santa Clara County population.  It does not state how many of these

20    persons were eligible to serve on juries or how many have been selected (or excluded) from jury

21    service.  In sum, petitioner has not shown that there has been a systematic exclusion of the groups

22    from the jury selection process.  Accordingly, he has not demonstrated that trial counsel's failure to

23    object to the composition of the jury pool constituted a deficient performance.

24        Because petitioner has not shown a deficient performance, the court does not reach the second

25    prong of Strickland, that is, whether trial counsel's performance resulted in prejudice to petitioner.

26    Siripongs, 133 F.3d at 737.

27        The court finds that the state court's determination was not contrary to, or an unreasonable

28

1   application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

2   determination of the facts in light of the evidence presented under 28 U.S.C. § 2254(d)(1), (2).

3   **B.     Insufficiency of Evidence to Support the Attempted Murder Conviction**

4           Petitioner contends that the evidence presented at trial was insufficient to support a charge of

5   attempted murder. Pet., P. & A. at 61.  At most, he contends, it supports a charge of shooting at an

6   occupied vehicle, assault with a deadly weapon or attempted voluntary manslaughter.  Id.  It appears

7   that this claim was not raised on appeal.

8           A federal court reviewing collaterally a state court conviction does not determine whether it is

9   satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335,

10  338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the

11  light most favorable to the prosecution, any rational trier of fact could have found the essential

12  elements of the crime beyond a reasonable doubt.'"  See id. (quoting Jackson, 443 U.S. at 319).  Only

13  if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be

14  granted.  See Jackson, 443 U.S. at 324.

15          California punishes "[e]very person who attempts to commit any crime, but fails, or is

16  prevented or intercepted in its perpetration."  Cal. Pen. Code § 664.  California defines murder as

17  "unlawful killing of a human being . . . with malice aforethought."  Cal. Pen. Code § 187.  "Malice,"

18  under California law, can be express or implied:  "[i]t is express when there is manifested a deliberate

19  intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable

20  provocation appears, or when the circumstances attending the killing show an abandoned and

21  malignant heart."  Cal. Pen. Code § 188.

22          Petitioner's claim is without merit.  After a review of the evidence in the light most favorable

23  to the prosecution, the court finds that a rational trier of fact could have found the elements of the

24  crime of attempted murder beyond a reasonable doubt.  A short review of the facts makes this clear.

25  Officer Garcia followed petitioner's car after it nearly hit his patrol car while speeding.  Op. at 5.  As

26  Garcia followed petitioner into a parking lot, he heard a blast and felt glass in his hand and saw

27  "spider webbing" on the right side of his windshield.  Id  He saw petitioner exit his vehicle.  Garcia,

28

United States District Court
For the Northern District of California

1  after stopping his vehicle and reaching for his radio, heard a second shot fired from a "high powered

2  weapon." Id.  Garcia tried to look at petitioner, but ducked when he heard a third shot and felt more

3  bits of glass on his face.  Id.  Again, Garcia raised his head and again he heard another shot.  Id.

4  Garcia responded with gunshots and petitioner ran off.  Id. at 5-6.  An inspection of Garcia's vehicle

5  revealed three bullet holes in the windshield, two in the car's hood, and two in the driver's headrest.

6  Id. at 6.  "The headrest holes indicated that Garcia would have been hit in the head had he been

7  sitting upright at the time the shots were fired."  Id.

8          The court finds that a rational trier of fact could find from the headrest evidence alone that

9  petitioner committed the offense of attempted murder  –  a rational trier of fact could find that if

10 Garcia had not ducked, those bullets buried in the headrest would have entered his skull.  Considering

11 the fact that the bullets were fired at the headrest and more than once, a rational trier of fact could

12 find that petitioner attempted to kill Garcia with malice aforethought – such focused firing at a person

13 provides a basis to believe that petitioner had the deliberate intention to take away the life of a fellow

14 creature or had an abandoned or malignant heart.

15         The court finds that the state appellate court's determination was not contrary to, or an

16 unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

17 unreasonable determination of the facts in light of the evidence presented under 28 U.S.C. § 2254

18 (d)(1), (2).

19 **C.     Denial of the Right to Self-Representation**

20         Petitioner contends that the trial court, by refusing to grant his Faretta motion, deprived him

21 of his right to self-representation.  Pet., P. & A. at 64.

22         Petitioner made a Faretta request on November 13, 1996, the same day he filed his third

23 Marsden motion.  Op. at 18.  The trial court explained the consequences of self-representation and

24 petitioner withdrew his Faretta request the next day.  Id.  In December, petitioner asked the trial court

25 to appoint new counsel to file a motion for a new trial and to grant him pro per status.  Id.  Later that

26 month, the trial court appointed an attorney from the conflicts panel to represent petitioner in his

27 motion for a new trial.  Id.  In January, petitioner requested that he be allowed to represent himself

28

**United States District Court**
For the Northern District of California

1 "on a certain matter." Id.  In February, petitioner expressed his dissatisfaction with his new attorney

2 and asked to represent himself on all further matters. Id. Later that month, the trial court heard

3 petitioner's Faretta request. Id. at 18-19.  The trial court denied the request, finding it untimely made

4 because it was after the trial:  "in the interest of judicial economy and regard to your rights to present

5 properly a Motion for New Trial that the motion for self-representation is not timely and therefore

6 denied." Id. at 19.

7      The state appellate court found that the trial court did not abuse its discretion in denying

8 petitioner's Faretta request because it properly considered the quality of counsel's representation,

9 petitioner's prior proclivity to substitute counsel, the reasons for the request, and the disruption or

10 delay which might reasonably be expected to following the granting of the motion.  Op. at 20-21.

11      A criminal defendant has a Sixth Amendment right to self-representation.  Faretta v.

12 California, 422 U.S. 806, 832 (1975).  While a trial judge may doubt the quality of representation that

13 a defendant may provide for himself, the defendant must be allowed to exercise his right to

14 self-representation so long as he knowingly and intelligently waives his right to counsel and is able

15 and willing to abide by rules of procedure and courtroom protocol.  See McKaskle v. Wiggins, 465

16 U.S. 168, 173 (1984).

17      In Faretta itself, the Supreme Court focused on the language describing Faretta's request to

18 represent himself as having been made "weeks before trial," 422 U.S. at 835, is part of the holding of

19 the Court, and thus is "clearly established Federal law, as determined by the Supreme Court of the

20 United States," for purposes of relief under the current version of 28 U.S.C § 2254(d).  Moore v.

21 Calderon, 108 F.3d 261, 265 (9th Cir. 1997).  After Moore, we know that Faretta clearly established

22 some timing element, but we do not know the precise contours of that element beyond the fact that

23 requests made "weeks before trial" are timely.  Marshall v. Taylor, 395 F.3d 1058, 1061 (9th Cir.

24 2005).  Because the Supreme Court has not clearly established when a Faretta request is untimely,

25 other courts, including state courts, are free to do so, as long as they comport with the Supreme

26 Court's holding that a request made "weeks before trial" is timely.  Id. (holding that California court

27 was not "contrary to" clearly established Supreme Court law under 28 U.S.C. § 2254(d) when it

28

United States District Court
For the Northern District of California

Order Denying Petition for Writ of Habeas Corpus
G:\pro-se\sj.rmw\hc.00\Himmelberger198.dsm.md     24

United States District Court
For the Northern District of California

found that petitioner's <u>Faretta</u> request on the first day of trial before jury selection untimely).

A request to represent oneself "need not be granted if it is intended merely as a tactic for delay." <u>United States v. Flewitt</u>, 874 F.2d 669, 674 (9th Cir. 1989). A court may consider (1) the effect of any resulting delay on the proceedings, and (2) events preceding the motion, to determine whether they were consistent with a good faith assertion of the <u>Faretta</u> right and whether the defendant could reasonably be expected to have made the motion at an earlier time. <u>Avila v. Roe</u>, 298 F.3d 750, 753-54 (9th Cir. 2002).

Petitioner's claim is without merit. The court finds no evidence to support petitioner's contention that he was impermissibly denied his right to self-representation. The untimeliness of petitioner's request is without question. Though neither the Supreme Court nor the Ninth Circuit has stated a bright-line rule for the exact moment when a <u>Faretta</u> motion is untimely, the general rule is that such a proper request should be made weeks before trial. Petitioner's motion came after his trial and therefore cannot be considered, under the general <u>Faretta</u> rule, timely.

The court concludes that the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2).

## CONCLUSION

The court finds that petitioner has failed to show any violation of his federal constitutional rights in the underlying state court proceedings. Accordingly, the petition for writ of habeas corpus is DENIED. This order terminates all motions.

The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

DATED: __ 5/23/08 _____

_____
RONALD M. WHYTE
United States District Judge